# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THOMAS D. MURRAY and TDM PROPERTY INVESTMENTS LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2018-0819-KSJM |
| SHANNON ROLQUIN, and COLLEEN MCGUIGAN, | ) ) ) | |
| Defendants. | ) ) ) | |
| COLLEEN MCGUIGAN, | ) ) | |
| Counterclaim-Plaintiff, | ) ) | |
| v. | ) ) ) | |
| THOMAS D. MURRAY and TDM PROPERTY INVESTMENTS LLC | ) ) ) | |
| Counterclaim-Defendants. | ) ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: December 6, 2022
Date Decided: March 9, 2023

Kevin R. Shannon, Christopher N. Kelly, Jaclyn C. Levy, Daniel M. Rusk, IV, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Edward A. Marod, Michael D. Simon, GUNSTER, West Palm Beach, Florida; *Counsel for Plaintiffs and Counterclaim - Defendants Thomas D. Murray and TDM Property Investments LLC*.

Richard P. Rollo, Angela Lam, Melissa A. Lagoumis, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Robert D. Sweeney, John J. Scharkey, SWEENEY, SCHARKEY & BLANCHARD LLC, Chicago, Illinois; *Counsel for Defendant and Counterclaim-Plaintiff Colleen McGuigan*.

**McCORMICK, C.**

This is the tail end of a lengthy and bitter dispute among Norbert Murray's children over ownership of a corporation formed by Norbert, Naples Building Corporation ("NBC" or the "Company"). In this chapter, youngest sibling Colleen claims that her oldest brother Thomas defrauded her by exercising an option to buy her interest in NBC. Colleen claims that, at the time Thomas exercised the option, he knew that the option bore a cut-and-paste forgery of Colleen's signature. The option is dated 1988. Thomas exercised the option in 2006. Colleen did not assert her claim of fraud until 2021. Thomas argues that Colleen's claim is time-barred, and the court held a limited trial on this defense. This post-trial decision grants judgment in favor of Thomas.

## I.  FACTUAL BACKGROUND

Trial took place over one day. As reflected in the Schedule of Evidence submitted by the parties, the record comprises 270 joint trial exhibits, trial testimony from three fact witnesses, deposition testimony from three fact witnesses, and stipulations of facts in the pre-trial order.[1] In what is intended as an act of kindness, this factual background omits many of the allegations that the sibling litigants levied against each other. Moreover, to avoid duplication, some of the factual findings are set out in the legal analysis.

---

[1] C.A. No. 2018-0819-KSJM, Docket ("Dkt.") 240 ("Joint Schedule of Evid."). This decision cites to: trial exhibits (by "JX" number); the trial transcript, Dkt. 228 (by "Trial Tr. at" page, line, and witness); stipulations of fact in the Pretrial Stipulation and Order, Dkt. 217 ("PTO"); and the deposition transcripts of Thomas McGuigan and Thomas D. Murray (by the deponent's name and "Dep. Tr. at" page and line).

## A. Formation Of NBC

Norbert spent much of his adult life in the business of commercial real estate.[2] Although he had significant experience and early success in property development, by the late 1980's, Norbert "could foresee the upcoming years as being especially troubling and I needed my family to assist me with running the business."[3] Seeking "a fresh avenue of growth that was not entangled with these problems," Norbert began forming Murray family-owned entities to manage his real estate business.[4]

Norbert formed NBC in 1988 and "to separate . . . from my past troubles."[5] NBC was based in Naples, Florida.[6] Its original stockholders were Norbert, Norbert's wife Marjorie, and their five children: Thomas, Shannon (Rolquin), Michael, Kimberly (Meek), and Colleen (McGuigan).[7] Norbert named Thomas President of NBC.[8] Due to Norbert's felony conviction and personal bankruptcy, Norbert held the position of "consultant" with the Company.[9] Thomas managed NBC for over 30 years and took responsibility for leasing its properties.[10]

---

[2] JX-152 at 3.

[3] *Id.* at 4.

[4] *Id.*

[5] *Id.*

[6] *Id.* at 3.

[7] *Id.* at 4.

[8] *Id.*

[9] Trial Tr. at 9:4–12 (Thomas).

[10] *Id.* at 8:22–9:3 (Thomas).

NBC had little to no value when it was formed.[11] Thomas contributed three strip malls to NBC in 1988.[12] Thomas understood that, in exchange for these properties, he obtained an option to acquire any NBC shares held by other family members for $250 each.[13] NBC's corporate records contain minutes of a Special Meeting of the Board of Directors of NBC, which reference a February 15, 1988 meeting in Naples, Florida among the Murray family members.[14] The only matter addressed in the minutes is Thomas's option to purchase the NBC shares held by the other family members for $250 (the "1988 Option").[15] Neither Thomas nor Colleen recall attending the meeting.[16] Colleen testified

---

[11] *Id.* at 9:13–16 (Thomas).

[12] JX-14; JX-15; JX-16; Trial Tr. at 11:8–15:15 (Thomas).

[13] Trial Tr. at 17:17–24 (Thomas) (testifying that "I was deeding my property to . . . NBC and I needed an option").

[14] JX-8.

[15] The relevant text of the Special Meeting minutes (JX-8) reads:

> Resolved that Thomas D. Murray has the authority to purchase the shares of Naples Building Corporation Stock that has been issued to the Stockholders of said corporation. The purchase price has been determined to be Two Hundred and Fifty Dollars ($250.00) per Stockholder. It has further been resolved that there be no prior authorization required from said Stockholders to purchase said shares of stock, and that Thomas D. Murray shall have the rights and privileges that have been attached thereto.

[16] Trial Tr. at 18:7–17 (Thomas); *id.* at 155:5–20 (Colleen). Thomas did not draft the 1988 Option and does not recall when he first saw it. *Id.* at 18:7–17 (Thomas). Although not relevant to the issues in this trial, Colleen speculates that Thomas must have drafted the 1988 Option because he benefitted from it. Dkt. 234 ("Colleen's Answering Post-Trial Br.") at 46 (citing Trial Tr. at 92:6–9 (Thomas)). But Norbert also benefited from the 1988 Option. After Norbert's felony conviction and bankruptcy, Norbert's livelihood was tied to the success of NBC and Thomas's willingness to keep Norbert on as a consultant. Trial Tr. at 9:4–12 (Thomas). And as Colleen recalls, it was Norbert (not Thomas) who

that she has "always known" that she did not attend the stockholders' meeting in 1988.[17]

Thomas, at least, was generally aware of the 1988 Option, which was referenced in his financial statements as an asset.[18]

Colleen was nineteen and attending college in Indiana when Norbert formed NBC.[19] Colleen stayed in the Midwest after graduating from college and enjoyed a career in Chicago working for the federal government.[20] Colleen's approach to NBC could best be characterized as "hands-off": she described herself as the "the only person" in the family who never worked for the business;[21] she never loaned money to NBC or guaranteed any of its debts;[22] and she never received a dividend or distribution from NBC.[23] Still, as an NBC stockholder, Colleen always accommodated her family's requests to execute corporate documents.[24]

---

"ambushed" her and threatened to "destroy" her if she did not transfer her shares to Thomas. *Id.* at 161:17–162:1 (Colleen).

[17] Trial Tr. at 155:5–20 (Colleen).

[18] *See, e.g.*, JX-22.

[19] Trial Tr. at 101:19–102:6, 187:2–5 (Colleen); *id.* at 261:1–9 (Thomas McGuigan).

[20] *Id.* at 98:21–99:2 (Colleen).

[21] *Id.* at 97:6–12 (Colleen).

[22] *Id.* at 157:17–20 (Colleen).

[23] *Id.* at 166:14–16 (Colleen).

[24] *Id.* at 101:19–102:6 (Colleen) ("I just know that when I was younger, they would ask for my signature and I would provide it."); JX-18. While there has been confusion regarding the number of shares of NBC stock owned by Colleen due to the existence of two sets of stock certificates, Colleen owned either 12.4% or 12.6% of NBC. *Compare* JX-11, *with* JX-13.

## B. The FDIC Litigation

Norbert's "past troubles" caught up to him in 1992, when he was convicted of felonies involving fraud against federally insured savings institutions.[25] Norbert failed to pay the $600,000 fine imposed in connection with his conviction.[26] As a result, in 1997, the FDIC filed an action for fraud, conspiracy, civil theft, and other claims against numerous entities, including NBC and its subsidiaries.[27] The members of the Murray family were also named as defendants in the FDIC action as NBC stockholders.[28]

Settlement negotiations with the FDIC spurred conversations about Colleen transferring her interest in NBC to Thomas in exchange for his capital contributions. Norbert twice pressured Colleen to transfer her NBC shares to Thomas during the negotiations, as Colleen testified credibly and at length during trial.

The first time was in May 1999. Norbert and Thomas requested that Colleen come to Florida to participate in an aspect of the FDIC litigation.[29] On the evening of her arrival, Norbert "ambushed" Colleen in the family kitchen,[30] pressuring her to sign a document relinquishing her shares to Thomas.[31] Colleen signed the document.[32] She then called her

---

[25] PTO ¶ 23.

[26] *Id.* ¶ 24.

[27] *Id.*; *see also FDIC v. Norbert Murray et al.*, 97-380-CIV-FTM-10D (M.D. Fla. 1997).

[28] *FDIC v. Norbert Murray et al.*, 97-380-CIV-FTM-10D.

[29] Trial Tr. at 106:6–12 (Colleen).

[30] *Id.* at 161:17–162:1 (Colleen).

[31] *Id.* at 161:8–16 (Colleen).

[32] *Id.* at 107:4–21 (Colleen).

husband, Thomas McGuigan, who advised her to rescind her consent and rip up the document, which she did.[33] She attended a meeting with the FDIC the next day and then returned home to Illinois.[34]

The second time was in June 1999. Colleen and her husband were contacted by Norbert, Norbert's attorney, and Thomas at separate times, each informing Colleen that she could not participate in the FDIC settlement unless she relinquished her shares of NBC to Thomas.[35] Michael advised Colleen that he thought NBC was worth $6–7 million and that Colleen should consult with an attorney before relinquishing her shares.[36] Colleen sought advice from her attorney,[37] and without reading the document, declined to relinquish her NBC shares in exchange for participation in the FDIC settlement.[38]

The FDIC agreed to settle the FDIC litigation for $1.5 million, and the action was dismissed in 2000.[39] Thomas funded the settlement.[40] None of the other family members contributed. As Colleen explained: "Q. So as long as it got paid, you really didn't care where it came from? A. Exactly."[41] Thomas believed that he became the only stockholder

---

[33] *Id.* at 107:21–108:7 (Colleen). To distinguish Thomas Murray from Thomas McGuigan, this decision uses Mr. McGuigan's full name.

[34] *Id.* at 108:15–109:18 (Colleen).

[35] *Id.* at 109:19–110:2 (Colleen); JX-53.

[36] Trial Tr. at 110:6–20 (Colleen).

[37] JX-53; JX-54.

[38] Trial Tr. at 111:1–22 (Colleen).

[39] PTO ¶ 25.

[40] Trial Tr. at 25:3–26:6 (Thomas).

[41] *Id.* at 164:4–24 (Colleen).

in NBC as a consequence of funding the settlement,[42] and contemporaneous tax records substantiate that Thomas held that belief.[43]  But in fact, at the close of the FDIC litigation, each member of the Murray family retained their interest in NBC.[44]

## C.     The 2006 Agreement

After the settlement, the family drama quieted down for a few years.  Then, in 2006, Thomas's accountants advised him via letter that he should convert NBC to an S Corporation to minimize his tax liability.[45]  Since an S Corporation is a flow-through tax entity, all of NBC's income would be taxable to each individual stockholder, regardless of whether they received distributions from the Company that year.[46]  As explained by Thomas's accountants, this conversion made sense under Thomas's belief that he was a sole stockholder, as he could streamline his income from NBC into his personal income taxes.[47]

If NBC had multiple stockholders, however, the implications would be more complicated—the Murray family members could be in a financial lurch if NBC's new tax status imposed unexpected tax burdens on them without capital to cover the liability.  As a

---

[42] *Id.* at 27:1–28:5 (Thomas).

[43] *See* JX-106, JX-108–09; JX-111; JX-114; JX-116; JX-120; JX-124; JX-127; JX-135; JX-173 (Form K-1 filings for NBC from 2007 through 2017 indicating Thomas as the sole stockholder of NBC).

[44] Dkt. 231 ("Thomas's Opening Post-Trial Br.") at 9 n.6; JX-68; JX-70; JX-98.

[45] Trial Tr. at 28:23–30:16 (Thomas).

[46] *Id.*

[47] JX-79.

result, even though Thomas believed himself to be NBC's sole stockholder, his accountants recommended that he exercise the 1988 Option to eliminate any uncertainty.[48]

At the suggestion of his accountants, Thomas retained Florida counsel to assist with NBC's conversion to an S Corporation and Thomas's exercise of the 1988 Option.[49] His Florida counsel prepared documents for each NBC stockholder to relinquish their shares to Thomas in exchange for $250 (the "2006 Agreement").[50] The 2006 Agreement stated that Thomas was exercising his rights under the 1988 Option to purchase his family members' interests in NBC.[51] The 2006 Agreement also contained a release clause that forever discharged Thomas and NBC from liability for claims arising out of the family members' stock ownership.[52] The 2006 Agreement stated that the signatory "is not relying on any representations or warranties by Thomas D. Murray except for those representations

---

[48] *Id.* In their letter dated May 19, 2006, Thomas's accountants stated:

> In light of the potentially very negative impact to the shareholders of the Company in it's [sic] election of S Corporation status, we have recommended that you exercise the option to purchase the shares of the Company held by its other shareholders. After such exercise, the other shareholders would not be responsible for the additional income taxes that would occur after the S Corporation election.

*Id.*

[49] Trial Tr. at 30:17–23 (Thomas).

[50] *Id.* at 30:24–31:11 (Thomas).

[51] *See* JX-87 § 2.1 ("Exercise of Option. Thomas D. Murray hereby exercises the [1988] Option to purchase the Ownership Interests.") (emphasis in original).

[52] *Id.* § 5.1.

8

specifically set forth in this Agreement[.]"[53] The 1988 Option was attached as "Exhibit A" to the 2006 Agreement.[54]

In June 2006, Thomas sent the 2006 Agreement to each of the family members, accompanied by payment of $250.[55] Norbert supported the 2006 Agreement and believed that his daughters signed the 2006 Agreement because he personally asked them to do so.[56] Norbert, Marjorie, Colleen, Shannon, and Kimberly promptly signed the 2006 Agreement.[57] Thomas testified that he did not recall any discussions with Colleen in 2006 regarding the 2006 Agreement or the 1988 Option.[58]

Colleen testified that she read both the 2006 Agreement and the 1998 Option before signing the 2006 Agreement and initialing every page.[59] She also testified that the first time she recalled seeing the 1988 Option was when she received the 2006 Agreement.[60] When she reviewed the 1988 Option, Colleen did not recall signing it.[61] Colleen testified

---

[53] *Id.* § 4.2(d).

[54] *Id.* at 6–7.

[55] Trial Tr. at 32:1–8 (Thomas).

[56] JX-152 at 6; *see also* Trial Tr. at 34:7–12 (Thomas).

[57] Although no longer relevant, there was a dispute regarding whether Michael signed the 2006 Agreement.

[58] Trial Tr. at 32:12–15 (Thomas).

[59] *Id.* at 167:14–168:3, 172 (Colleen); JX-87.

[60] Trial Tr. at 158:6–17 (Colleen).

[61] *Id.* at 172:16–24 (Colleen).

that Thomas told her over the phone that she had to sign the 2006 Agreement because she, along with the entire Murray family, had signed the 1988 Option.[62]

Also in June 2006, Michael copied his siblings on a letter he sent to Thomas explaining Michael's reasons for not signing the 2006 Agreement.[63] Michael's letter stated that "with respect to the purported option agreement to redeem the stock, I do not believe that it is enforceable."[64] Though Colleen testified that she did not recall reading this document, she is the one who produced the document in discovery.[65]

In early 2007, Thomas converted NBC into an S Corporation.[66] For a decade, Thomas was the only NBC stockholder to receive a Form K-1, and each of NBC's annual tax filings identified Thomas as NBC's sole stockholder.[67] During this period, Thomas contributed over $15 million of his own funds to NBC, which significantly reduced NBC's debt.[68] Thomas credibly testified that he would not have contributed his own funds to pay NBC's debts unless he believed that he owned 100% of NBC.[69]

---

[62] *Id.* at 173:15–174:16 (Colleen).

[63] JX-259.

[64] *Id.* at 1.

[65] Trial Tr. at 177:8–178:17 (Colleen).

[66] JX-102.

[67] *See, e.g.*, JX-106, JX-108, JX-09, JX-111, JX-114, JX-116, JX-120, JX-124, JX-127, JX-135, JX-173.

[68] Trial Tr. at 34:16–35:12 (Thomas); *see also* Thomas's Opening Post-Trial Br., Ex. C (trial demonstrative detailing contributions).

[69] Trial Tr. at 35:9–12 (Thomas).

10

### D. 2017 Brings More Drama.

After a decade-long familial ceasefire, tension rose once more in the Murray family in 2017.

The first relationship to fall was between Norbert and Thomas. The father-son duo had worked together for over 30 years, and Thomas enjoyed working with his father.[70] Norbert was generously compensated for his work as a "consultant" for NBC.[71] By 2017, however, Norbert was in his 80s and dealing with health issues.[72] Around this same time, Thomas hired an outside accountant, Howard Markoff, to review the accounting records for his businesses.[73] Markoff questioned why Norbert was paid so generously given his limited role at NBC,[74] and Thomas reduced Norbert's annual compensation to a reasonable amount.[75] This angered Norbert.[76]

Friction also rose between Thomas and his sister Shannon, who worked at NBC as its secretary and a director.[77] In the fall of 2017, Shannon informed Colleen that Thomas was planning to restructure his business interests by merging NBC into his controlled entity, TDM Property Investments LLC ("TDM"), among other things.[78] Shannon began

---

[70] *Id.* at 17:12–16 (Thomas).

[71] JX-152 at 8–9.

[72] Trial Tr. at 122:1–13 (Colleen).

[73] *Id.* at 35:13–36:10 (Thomas).

[74] *Id.* at 37:5–12 (Thomas).

[75] *Id.* at 37:13–19 (Thomas).

[76] *Id.* at 37:20–38:8 (Thomas).

[77] *Id.* at 73:18 – 21 (Thomas); *id.* at 124:5–12 (Colleen).

[78] *Id.* at 299:2–8 (Thomas McGuigan); *see also* JX-172.

to secretly copy thousands of pages of documents relating to NBC and Thomas's other business interests.[79]  Shannon started sending the documents to Colleen in November 2017,[80] and Colleen's husband reviewed them.[81]  Shannon was fired from NBC in early 2018.[82]

Armed with these documents, Thomas McGuigan, Colleen, and her siblings began investigating potential claims against Thomas.[83]  That investigation led them to believe there were "lots of problems" with the 1988 Option—and that both the 1988 Option and 2006 Agreement were invalid and void for various reasons.[84]  Colleen's interrogatory responses admit that she noticed "peculiarities" in the 1988 Option starting in December

---

[79] JX-202; JX-253.  Colleen claims that Shannon secretly copied the NBC documents because Thomas was "destroying documents."  Trial Tr. at 124:2–125:1 (Colleen).  As made clear at trial, however, all of the office employees participated in the shredding of old records in May 2017, more than six months before Michael or anyone else claimed to be a stockholder of NBC.  *Id.* at 36:11–37:4 (Thomas).  Thomas testified credibly that Markoff suggested that Thomas shred old documents around the office that were no longer necessary.  *Id.* at 35:13–36:10 (Thomas).   There is also a contemporaneous document, a receipt from May 4, 2017, showing that Thomas's office disposed of two 95-gallon containers of paper, refuting Colleen's testimony that this document dump was done in fall 2017 to destroy documents.  *See* JX-132.

[80] Trial Tr. at 124:2–125:1 (Colleen).

[81] *Id.* at 180:24–181:6 (Colleen); *id.* at 287:15–18 (Thomas McGuigan).

[82] *Id.* at 134:2–6 (Colleen).

[83] *Id.* at 199:2–7 (Colleen) (agreeing that she and her husband "were considering potential claims as minority stockholders of NBC").

[84] Thomas McGuigan Dep. Tr. at 88:17–89:12; JX-240 at 2 (Colleen's interrogatory responses stating that "on or around December of 2017, [Colleen] noticed some peculiarities with respect to the content to the [1988] Option"); Trial Tr. at 188:4–7 (Colleen).

2017, including that Colleen was "attending college out of state" on the date of the purported Special Meeting.[85]

### E. The Internal Partnership Memorandum

The first concerted effort to compile claims against Thomas was the "Implied Partnership Memorandum," a detailed 12-page, single-spaced document, which was intended to provide prospective counsel with the information necessary to evaluate claims against Thomas.[86] The document is written in the first person from Norbert's perspective.[87] Norbert's health had deteriorated significantly by this time, however, so Thomas McGuigan helped Norbert type up his thoughts.[88] The 1988 Option and the 2006 Agreement were attached to the Implied Partnership Memorandum.[89]

On December 1, 2017, Colleen circulated a draft of the Implied Partnership Memorandum to Michael and Shannon by email.[90] The next day, Colleen texted Michael that "Dad and Shannon are in process of adding and reviewing it as well."[91] On December 3, 2017, Colleen emailed the final version of the Implied Partnership Memorandum to Shannon with a cover note—"fresh start!!"[92] Colleen also emailed the Implied Partnership

---

[85] JX-240 at 3; Trial Tr. at 186:12–187:8 (Colleen).

[86] JX-152; *see also* Trial Tr. at 190:24–191:5 (Colleen); *id* at 265:9–266:15 (Thomas McGuigan).

[87] JX-152.

[88] Trial Tr. at 136:9–14 (Colleen).

[89] JX-152 at 14–19.

[90] JX-148.

[91] JX-150; Trial Tr. at 191:23–192:24 (Colleen).

[92] JX-152 at 1.

Memorandum to her brother Michael on December 4, 2017.[93] When asked why Colleen sent this document to Michael, Thomas McGuigan testified, "Well, again, you know, as I've said numerous times, people were scratching their heads at this point."[94] According to Thomas McGuigan, one of the questions being asked was: "Is Colleen a shareholder?"[95]

The Implied Partnership Memorandum has a separate section titled "NBC Purported Option," which states in part:

> ***There are lots of problems with this option*** concept including the fact that a) the shareholder minute meeting is dated 14 days before NBC was legally formed in the state of Delaware, b) a few of the shareholders don't ever recall signing it and were attending college 1300 miles away on that day, c) there is no underlying instrument supporting and documenting the option, d) the option does not attempt to transfer shares at fair market value. (Why would any shareholder agree to someone acquiring a valuable interest for $250) e) the purported option is for the "authority to purchase shares of Naples Building Corporation stock that <u>has been</u> issued"—yet no stock had been issued on February 15, 1988.[96]

The Implied Partnership Memorandum also states that "there is a dispute over the authenticity, validity and enforceability of [the 1988 Option] and [the 2006 Agreement] where [Thomas] claims he had the right and did exercise the right to purchase all of the NBC shares for $250 per share."[97] Norbert's "primary settlement goal" was to invalidate

---

[93] *Id.*

[94] Thomas McGuigan Dep. Tr. at 60:9–17.

[95] *Id.*

[96] JX-152 at 6 (emphasis added).

[97] *Id.* at 13.

14

the "dubious" 1988 Option.[98]  To that end, the Implied Partnership Memorandum states that "Michael and the other shareholders . . . are considering pursuing legal remedies to invalidate the" 1988 Option.[99]

Colleen testified that she never read the Implied Partnership Memorandum, but her testimony is not credible.[100]  For one thing, she circulated the document to her siblings three times via email.  Contrary to Colleen's testimony, she was not merely a messenger silently passing along the Internal Partnership Memorandum to her siblings—she added cover text that the document was a "fresh start!!"[101]  Not only that, she texted Michael that Shannon and Norbert had been reviewing the document and adding to it.[102]  Colleen also emailed the Implied Partnership Memorandum to Kimberly on January 26, 2018, noting that the "memo . . . may be useful to you for any discussions with an attorney.  You would need to edit the memo as you see fit to apply to you, rather than me, before passing it along to an attorney."[103]  It is difficult to imagine how Colleen could know that the Internal Partnership Memorandum would be helpful in conversations with an attorney, and that the document would need to be tailored to Kimberly's interests, if Colleen had no knowledge

---

[98] *Id.* at 10.

[99] *Id.* at 7.

[100] Trial Tr. at 192:13–196:18 (Colleen).

[101] JX-152 at 1.

[102] JX-150.

[103] JX-177; Trial Tr. at 200:4–204:15 (Colleen).

15

of its contents. At the very least, Colleen concedes that nothing prevented her from reading the Implied Partnership Memorandum.[104]

### F. Continuing Investigations And The Settlement Term Sheet

Colleen and her husband continued investigating into the 1988 Option through December 2017. Thomas McGuigan testified as follows regarding the results of their investigation:

> And so once we, you know, looked -- at this point, it's what, December 16th, so I think we looked at the option agreement for the first time in real detail and said: Wait a second. You know, this is a -- this is a fraudulent document. This is absolutely ridiculous. This is dated before the formation of the company. . . . [T]his isn't my wife's signature. This isn't Michael's signature. You know, I could go through all the defects if you'd like.[105]

At this point, Colleen and her husband began exploring the types of claims that the siblings could make against Thomas as minority stockholders. Thomas McGuigan testified about these "discussions" in his deposition:

> Q. Did you have discussions with any of Colleen's siblings about bringing a claim as minority stockholders of NBC?
>
> A. You know, again, we're evaluating a lot. We're trying to -- trying to figure out what's going on, trying to sort things out. And I'm sure there were discussions as to, okay -- you know, for the first time, we see this 2006 option and recognize that it's defective, that -- on many fronts. We realized the conditions leading up to it and why it was executed, so people started scratching their head. And, you know, at that point, I

---

[104] Trial Tr. at 194:13–18 (Colleen); *see also id*. at 290:10–12 (Thomas McGuigan).

[105] Thomas McGuigan Dep. Tr. at 70:4–15. At trial, Colleen suggested that her husband may have "pointed out" alleged defects with the 1988 Option, but contends they were not "relevant" to her and not what she "cared" about. Trial Tr. at 184:13–186:6 (Colleen).

think they were -- people were asking questions. So yeah, there were probably some -- some discussions, yeah.

Q. Probably, but you don't know for sure?

A. My testimony is there were probably discussions, yeah.[106]

On December 16, 2017, Colleen and her husband prepared a "Settlement Term Sheet" to resolve the siblings' claims against Thomas.[107] That same day, Colleen emailed the Settlement Term Sheet to Shannon, Michael, and Kimberly, "Please review and add changes or comments as you see fit and pass them back to me."[108] Two minutes later, Colleen sent a follow-up email saying, "Also you do not need to sign this term sheet. Just want to be in agreement."[109]

In the Settlement Term Sheet, Colleen purported to transfer approximately 80% of NBC from Thomas to herself, her siblings, and her parents.[110] To support that claim, Paragraph 3 of the Settlement Term Sheet states: "Shareholders agree that any and all purported NBC shareholder options, agreements, or shareholder minutes conveying any right for any Shareholder to purchase NBC stock from any other Shareholder are invalid and declared null and void for various reasons."[111] Also, Paragraph 5 of the Settlement Term Sheet contains a mutual release, including for "[a]ny claims of fraud."[112]

---

[106] Thomas McGuigan Dep. Tr. at 88:17–89:12.

[107] Trial Tr. at 204:17–207:8 (Colleen).

[108] JX-162.

[109] JX-163.

[110] JX-162 at 2.

[111] *Id.*

[112] *Id.*

## G. The Siblings Pursue Litigation.

In January 2018, Colleen's husband contacted counsel "to discuss a possible engagement to evaluate possible claims that [Colleen] may have against [Thomas]."[113] Colleen was aware that her husband was speaking to counsel about claims against Thomas and did not object.[114]

In addition to consulting counsel, Colleen was doing her own "Google lawyering"—researching the rights of minority stockholders.[115] On February 2, 2018, Colleen sent an email to Kimberly stating: "Just wanted you to feel comfortable that mike is also a minority shareholder like the rest of us. We are only powerful together. Familiarize yourself with the rights of a minority shareholder if you want to be comfortable with those rights."[116]

On March 19, 2018, Michael filed a complaint asserting claims against Thomas and TDM (as successor to NBC).[117] Colleen was aware in March 2018 that Michael filed a complaint.[118] Although Colleen claimed at trial that she did not attempt to obtain a copy of the public filing,[119] she admitted that she reviewed Michael's complaint no later than June 2018 when she was subpoenaed.[120]

---

[113] JX-244 at 14.

[114] Trial Tr. at 220:6–21 (Colleen).

[115] *Id.* at 214:3–12 (Colleen).

[116] JX-184; Trial Tr. at 213:17–214:12 (Colleen).

[117] JX-192.

[118] Trial Tr. at 214:23–215:3 (Colleen).

[119] *Id.* at 215:12–15 (Colleen).

[120] *Id.* at 216:6–20 (Colleen).

Michael's complaint set forth a list of reasons why he believed that the 1988 Option was invalid:

> (a) it was allegedly executed before NBC existed (NBC did not become an entity until February 29, 1988) and was not subsequently ratified; (b) neither Thomas nor NBC gave consideration in exchange for the purported option; (c) it was not agreed to or executed by Michael; (d) it referred to stock that "has been issued" but no stock had been issued (the original stock certificates are dated February 29, 1988, the date of NBC's formation); (e) the terms are vague, ambiguous, and indefinite; and (f) a $250 option, which does not account for the value of NBC or the stockholders' varying interests, is unconscionable.[121]

Colleen testified that she was not surprised by anything Michael alleged in his complaint.[122]

In November 2018, Thomas filed a complaint against Michael, Colleen, and Shannon, alleging breach of fiduciary duty, aiding and abetting, civil conspiracy, and conversion.[123]

On January 23, 2020, Colleen was served with a court filing from Michael stating that: "Michael will show that the entire signature block of the [1988 Option] . . . was cut and pasted from a different NBC document on which Michael's signature was forged."[124]

---

[121] JX-192 at 6–7.

[122] Trial Tr. at 218:22–219:19 (Colleen).

[123] Dkt. 1.

[124] JX-232 at 2 n.2.

19

In February 2020, the court agreed to stay discovery (with the exception of Thomas's deposition) to allow Thomas to proceed with a motion for summary judgment on the grounds that Michael's claims were time-barred.[125]

Thomas was deposed on October 1 and 2, 2020.[126] Michael, Shannon, Thomas McGuigan, and Colleen all attended at various points.[127] Counsel presented Thomas with the signature block from the 1988 Option and the signature block from a second document, titled "Waiver of Notice of the Special Meeting of Shareholders of Naples Building Corporation" (the "Waiver").[128] The Waiver references a special stockholders' meeting on February 1, 1988, in Naples.[129] The signatories to the Waiver are the same signatories and in the same order as the February 15, 1988 Option: Shannon, Michael, Kimberly, Colleen, Norbert, and Marjorie.[130] Side by side, the similarities between the signature blocks on the Waiver and the 1988 Option become clear:

---

[125] Dkt. 102 (Feb. 25 Hr'g Tr.) at 21.

[126] Thomas Dep. Tr.

[127] *Id.* at 3:19–24; *id.* at 217:11–16.

[128] JX-7 at 1; Thomas Dep. Tr. at 124:3–125:22.

[129] JX-7 at 1.

[130] *Id.*



Waiver signature block, JX-7.      1988 Option signature block, JX-8.

Counsel asked Thomas whether he was aware of anyone cutting and pasting the signature block from the Waiver onto the 1988 Option; he credibly responded that he was not.[131] He conceded that the documents appeared to be a cut-and-paste forgery upon closer inspection: "Q: Sitting here right now, do you believe that this is the case, that this document is a forgery? . . . A. I don't believe -- I don't know if they were forgeries, but I do believe that it was placed on top of it."[132] Thomas testified in his deposition and credibly at trial that he did not cut-and-paste the signature block himself.[133] Thomas also credibly testified that he first realized the 1988 Option might contain a cut-and-paste

---

[131] Thomas Dep. Tr. at 125:20–22.

[132] *Id.* at 396:4–10.

[133] *Id.*; *id.* at 124:3–12; Trial Tr. at 83:11–14 (Thomas).

forgery during this litigation.[134]  This makes sense: the signatures on the 1988 Option did not appear abnormal because the signatures on the page *were* the signatures of Thomas and his family members.  Without seeing the 1988 Option side-by-side with the Waiver, there was little reason to suspect anything nefarious.  When asked at trial whether Collen knew that the 1988 Option signatures were fabricated, Thomas admitted that she had no more reason than he did to believe that her signature was forged.[135]

## H.     The Bifurcated Litigation

After full briefing and a hearing on Thomas's motion for summary judgment, the court denied Thomas's motion on June 8, 2021.[136]  Thomas and Michael then agreed to mediate the dispute, and the mediation was scheduled for September 1, 2021.

On August 31, 2021, at 6:13 PM, Colleen's counsel emailed Thomas's counsel, saying they were "preparing to file a counterclaim on behalf of Colleen McGuigan against Thomas and TDM in the coming days."[137]  Counsel did not state the basis for Colleen's claims in their email.[138]

Colleen filed her Amended Answer and Verified Counterclaims on September 27, 2021.[139]  Colleen asserted five counts in her counterclaim:

---

[134] Trial Tr. at 71:9–16 (Thomas).

[135] *Id.* at 92:10–19 (Thomas) ("I didn't know it was fabricated.  How would she know?").

[136] Dkt. 242 (June 8, 2021 Bench Ruling) at 21:3–15.

[137] JX-236 at 1.

[138] *Id.*

[139] Dkt. 137.

- In Count I, Colleen alleges fraud against Thomas for inducing her to sign the 2006 Agreement while knowing that the 1988 Option was invalid.

- In Count II, Colleen alleges equitable fraud against Thomas for inducing her to sign the 2006 Agreement while in a position of trust as her sibling and director of NBC.

- In Count III, Colleen alleges breach of fiduciary duty against Thomas for inducing her to enter the 2006 Agreement, usurping NBC's business opportunities, and merging NBC with TDM.

- In Count IV, Colleen alleges aiding and abetting against TDM for effectuating the merger between NBC and TDM.

- In Count V, Colleen alleges unjust enrichment against Thomas and TDM for depriving Colleen of her interest in NBC.

Thomas moved to bifurcate the action to first address the issue of whether Colleen's (and at the time, Michael's) claims were time-barred.[140] Recognizing that bifurcation could promote efficiency by breaking up the 30-year evidentiary record in this litigation, the court granted bifurcation.[141] Trial was scheduled for July 14 and 15, 2022, on the narrow issue of whether Michael and Colleen's claims against Thomas were time-barred.

On July 11, counsel submitted a letter reporting that mediation between Michael and Thomas had proven successful and that the two had reached an agreement in principle.[142] As a result, the July 14, 2022 trial in this matter was limited to the question of whether Colleen's claims against Thomas were time-barred.

---

[140] Dkt. 133.

[141] *See* Dkt. 157 (Nov. 8 Hr'g Tr.) at 37:3–7.

[142] Dkt. 225; *see also* Dkt. 227 (stipulation of dismissal with prejudice).

## II.    LEGAL ANALYSIS

The equitable doctrine of laches "prevent[s] someone who slumbers on her rights and delays unreasonably in filing suit from being permitted to prosecute her claims."[143] "While laches is a standalone doctrine, 'equity follows the law and in appropriate circumstances will apply a statute of limitations by analogy.'"[144] "The statute of limitations for a claim essentially provides the outermost limit for a plaintiff, filing in Chancery, to bring a claim, with laches typically acting to require even earlier filing."[145] Along with unreasonable delay, a defendant must also show that they are prejudiced by the delay, though the "Court may also presume prejudice if the claim is brought after the analogous limitations period has expired."[146]

The first step in a laches analysis is determining when the claim accrued.[147] "The general principle in Delaware is that the statute of limitations begins to run, *i.e.*, the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of

---

[143] *TrustCo Bank v. Mathews*, 2015 WL 295373, at *5 (Del. Ch. Jan. 22, 2015); *see also Daugherty v. Highland Cap. Mgmt., L.P.*, 2018 WL 3217738, at *7 (Del. Ch. June 29, 2018) ("Laches is an equitable defense designed to ensure that equity aids the vigilant, and not the dilatory.") (citation omitted).

[144] *Largo Legacy Gp., LLC v. Charles*, 2021 WL 2692426, at *9 (Del. Ch. June 30, 2021) (quoting *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007) (alterations omitted)).

[145] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 2012 WL 3201139, at *5 (Del. Ch. Aug. 7, 2012).

[146] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 979 (Del. Ch. 2015) (citing *In re Sirius*, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013)).

[147] *Largo Legacy*, 2021 WL 2692426, at *9 ("The statute of limitations begins to run at the time that the cause of action accrues[.]") (quoting *Tyson Foods*, 919 A.2d at 584).

24

the cause of action."[148] Where a claim is pursued in the Court of Chancery that would be barred by the applicable statute of limitations if pursued at law, laches will also bar the claim absent tolling or extraordinary circumstances.[149]

"The Delaware courts recognize three doctrines that may toll the statute of limitations: (1) inherently unknowable injuries, (2) fraudulent concealment, and (3) equitable tolling following a breach of fiduciary duties."[150] Inquiry notice, however, "universally limits tolling doctrines."[151] Tolling does not extend beyond the point when the plaintiff "was objectively aware, or should have been aware, of facts giving rise to the wrong."[152]

In this case, Colleen alleges that the harm occurred when Thomas induced her to sign the 2006 Agreement in June 2006. The parties agree that Colleen's claims are subject to a three-year statute of limitations.[153] The default limitations period thus expired in June 2009 absent tolling. Colleen argues that the limitations period was tolled, while Thomas contends that tolling doctrines are unavailable because Colleen was on inquiry notice.

---

[148] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998).

[149] *See Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013) ("A filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for the purposes of laches."); *Whittington v. Dragon Gp., LLC*, 991 A.2d 1, 7–10 (Del. 2009) (similar).

[150] *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *17 (Del. Ch. Dec. 1, 2009).

[151] *Lebanon Cty. Empls.' Retirement Fund v. Collis*, 287 A.3d 1160, 1212 (Del. Ch. 2022).

[152] *Tyson Foods*, 919 A.2d at 585; *see also Collis*, 287 A.3d at 121 ("Once the plaintiff is aware of the injury, or should have discovered it in the exercise of reasonable diligence, then the period for bringing a claim starts to run.").

[153] Thomas's Opening Post-Trial Br. at 23; Colleen's Answering Post-Trial Br. at 42.

Colleen filed her counterclaims against Thomas on September 27, 2021, meaning that if Colleen had inquiry notice before September 27, 2018, then her claims are time-barred.

The following factual findings support Thomas's position that Colleen was on inquiry notice:

- Twice in 1999, Norbert and others "ambushed" and pressured Colleen to sign documents transferring her interest to Thomas.[154] Colleen initially signed the document, but on the advice of her husband, ripped up the document.[155]

- In 2006, Colleen signed the 2006 Agreement, which appended the 1988 Option.[156] Colleen received, and produced in this litigation, a letter from Michael saying that he did not believe the 1988 Option was enforceable.[157]

- In late 2017, Thomas McGuigan helped Norbert draft the Internal Partnership Memorandum. Colleen sent this document by email three times, with text that it was a "fresh start!!"[158]

- By December 16, 2017, Colleen and her husband had "discussions" about all of the defects in the 1988 Options.[159] This discussion culminated in their joint preparation of the Settlement Term Sheet, which states that any NBC stockholders' options to "purchase NBC stock from any other Shareholder are invalid and declared null and void for various reasons."[160]

- By December 2017, Colleen was aware of "peculiarities" in the 1988 Option.[161]

- In January 2018, Colleen's husband contacted prospective counsel "to discuss a possible engagement to evaluate possible claims that [Colleen] may

---

[154] Trial Tr. at 161:17–162:1 (Colleen).

[155] *Id.* at 107:21–108:7 (Colleen).

[156] JX-87.

[157] JX-259.

[158] JX-152.

[159] Thomas McGuigan Dep. Tr. at 88:17–12.

[160] JX-162 at 2.

[161] JX-218.

have against [Thomas]."[162]  That same month, Colleen emailed the Internal Partnership Memorandum to Kimberly, advising that Kimberly could contact an attorney but would need to "edit the memo as you see fit to apply to you, rather than me, before passing it along to an attorney."[163]

- In March 2018, Michael filed his complaint against Thomas, alleging six reasons why the 1988 Option was invalid.  By Colleen's account, the latest she read these documents was in June 2018.

Colleen admits that she harbored suspicions about the authenticity of the documents, particularly during her investigation in 2017.   Still, she claims that what mattered to her was that the signature on the 1988 Option was her own, and so she did not pursue her claims once she concluded that the 1988 Option in fact contained her signature. Colleen testified credibly that she did not fully appreciate that the document was a cut-and-paste forgery until she attended Thomas's deposition in October 2020.  She also correctly points out that not even Thomas knew of the cut-and-paste job for over 30 years.

All of these facts ring true, but they do not render Colleen's claim timely.  "Inquiry notice does *not* require *actual* discovery of the reason for the injury.  Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct.  Rather, the statute of limitations beings to run when plaintiffs should have discovered the general fraudulent scheme."[164]  Tolling exceptions to statutes of limitations are "narrow and

---

[162] JX-244 at 14.

[163] JX-177; Trial Tr. at 200:4–204:15 (Colleen).

[164] *Dean Witter*, 1998 WL 442456, at *7 (emphasis in original); *see also Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005) ("[P]laintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury.").

designed to prevent injustice."[165]  Once a plaintiff is on notice of facts that should raise red flags of wrongdoing, "she is obliged to diligently investigate and to file within the limitations period as measured from that time."[166]  To borrow a line from Thomas's counsel: "there is a reason they call it inquiry notice and not everything notice."[167]

Even where the alleged wrongdoer is a fiduciary to the plaintiff, the plaintiff is "not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received [] were so suggestive of mismanagement."[168]  Even "the trusting plaintiff must still be reasonably attentive to his interest."[169]

This court has consistently dismissed claims as time-barred where the claimant had sufficient facts to discover wrongdoing, regardless of whether they knew the full extent of the harm.  For instance, in *In re Dean Witter Partnership Litigation*, the plaintiffs invested in a slew of defendant-controlled entities that promised high, stable returns.[170]  Meanwhile, the defendant used the capital to purchase his own underperforming investments and fudged the numbers on investors' returns by re-distributing their capital contributions.  The plaintiffs filed suit in 1996, relying on a 1990 annual report that disclosed on the first page that their annualized return was 7.5%.  A mere few pages later, however, the 1990 report

---

[165] *Pomeranz*, 2005 WL 217039, at *13.

[166] *Id.*; *see also Dean Witter*, 1998 WL 442456, at *7 n.49 ("Once a plaintiff is in possession of facts that make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice.").

[167] Dkt. 241 (Post-Trial Oral Arg. Tr.) at 17:9–10.

[168] *Dean Witter*, 1998 WL 442456, at *9.

[169] *Id.* at *8.

[170] *Id.* at *3.

showed that distributions consistently exceeded the entities' income and that the capital accounts consistently declined. The presence of this "inherently contradictory information" in the 1990 report "alone [was] sufficient notice of wrongdoing to prompt inquiry."[171] Thus, the claims were time-barred by 1996.[172]

Then-Vice Chancellor Strine addressed a similar set of circumstances in *Pomeranz v. Museum Partners, L.P.*[173] There, the plaintiffs invested in two ventures with the sole purpose of acquiring a controlling interest in a French company. Defendants, the majority investors in both ventures, withdrew their capital contributions and executed a favorable withdrawal agreement in April 2000 at the expense of the remaining interest holders. Without this capital, the ventures' purpose was inevitably thwarted, and the plaintiffs lost significantly on their investment. Plaintiffs received the partnership's financials in April 2000 that showed its capital accounts had decreased by 60%, but the financial statements still showed positive profit projections. Plaintiffs contended that they could not have known the extent of the harm they would suffer until they learned the full terms of the withdrawal agreement in March 2001.

The Vice Chancellor disagreed. Although the plaintiffs did not yet know the entire extent of their damages in April 2000, the proverbial writing was on the wall. The ventures' only purpose was to buy up blocks of stock in a French company, yet 60% of their capital had disappeared. Any hopeful promises of continued positivity rang hollow once the

---

[171] *Id.* at *8.

[172] *Id.*

[173] 2005 WL 217039, at *13.

29

plaintiffs knew that their capital had been slashed. The plaintiffs could not "simply wait until the details of the harm are provided to them before the statute begins to run"; rather, "[k]nowing of a wrong is sufficient to require action to preserve one's rights."[174] Because they were on inquiry notice in April 2000, the plaintiffs' suit was time-barred when they filed it in 2004.[175]

Here, Colleen advances a narrative akin to those in *Dean Witter* and *Pomeranz*: she believed that the 1988 Option had her signature, she trusted Thomas, and she did not learn of the cut-and-paste forgery until October 2020. Unfortunately, lack of actual notice will not save Colleen's claims.

Colleen knew of a laundry list of defects in the 1988 Option before September 2018. She had "always known" that she had not attended a stockholder meeting at which the option was allegedly approved.[176] As in *Dean Witter*, the 1988 Option was inherently defective on its face, as it purported to issue stock in the corporation two weeks before NBC was even formed. Colleen cannot rely on her blissful ignorance of the family business when repeatedly presented with a two-page document that contained such blatant internal consistencies. Colleen's own interrogatory responses admit that she was aware of "peculiarities" in the 1988 Option by December 2017. At this point, it was her own obligation to ensure the propriety of the option.

---

[174] *Id.* at *11.

[175] *Id.*

[176] Trial Tr. at 155:5–20 (Colleen).

Nor can Colleen rely on her adamant commitment to ensuring that the 1988 Option had her actual signature. Although she credibly testified that this was the only aspect that mattered to her, that determination alone does not satisfy her obligation. That would be as if the plaintiffs in *Pomeranz* confirmed that the ventures' bank accounts indeed reflected the capital depletion depicted in the financials, then called foul because they failed to put together the implications of those numbers until they were left penniless. Colleen cannot deny that she was aware of facial deficiencies in the 1988 Option that could render it unenforceable. She was also armed with Michael's complaint, which alleged that the 1988 Option was unenforceable for all the same reasons. That the dupe ultimately committed was different than the one Colleen cared about does not change the outcome. She cannot hide behind her ignorance of the full scope of the underlying fraud when she knew that some wrongdoing was afoot, just not the one she expected.

Colleen also cannot rely on her dependence on Thomas as a fiduciary. She rests her claim on her characterization that Thomas encouraged her to sign the 2006 Agreement because everyone had signed the 1988 Option and it was legitimate. She claims that she read the 1988 Option before signing the 2006 Agreement, yet still argues that she could not have known that the 1988 Option was fraudulent. As she read on the face of the document in 2006 and rehashed again with her husband in December 2017, Colleen could tell at the very least that the document declared her presence at a meeting in Naples when she knew she was attending college in Indiana. This is precisely the sort of information that would put a "reasonably attentive" stockholder on guard and forms a basis for inquiry notice.

31

The court need not pinpoint a single moment in time that Colleen had inquiry notice; the relevant question is whether she had inquiry notice before September 27, 2018. As explained above, Thomas presented ample evidence of such notice in this time frame. As a result, tolling ceased and the limitations period expired before Colleen brought suit.

Finally, Colleen argues that Thomas's laches defense is barred by the doctrine of unclean hands. Unclean hands derives from the equitable maxim that "[h]e who comes into equity must come with clean hands."[177] "If a plaintiff's 'claim grows out of or depends on, or is inseparably connected with, his own prior fraud, a court of equity will, in general, deny him any relief.'"[178] The purpose of the unclean hands doctrine "is to protect the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims . . . . As such it is not a matter of defense to be applied on behalf of a litigant; rather it is a rule of public policy."[179] "[A]t bottom, the unclean hands doctrine is a rule of public policy."[180] This court has broad authority to consider unclean hands, and is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."[181]

---

[177] 2 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 397 (5th ed. 1941).

[178] *United BioSource LLC v. Bracket Hldg. Corp.*, 2017 WL 2256618, at *7 (Del. Ch. May 23, 2018) (quoting Pomeroy, *supra* n.177, *A Treatise on Equity Jurisprudence* § 401).

[179] *Skoglund v. Orgmand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976).

[180] *Morente v. Morente*, 2000 WL 264329, at *3 (Del. Ch. Feb. 29, 2000) (internal quotation marks and citations omitted).

[181] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522–23 (Del. Ch. 1998).

Colleen's proposed application of unclean hands is atypical: it is usually asserted by a defendant when a claimant has effectively forfeited their rights to bring suit by engaging in inequitable conduct of their own.[182] Unclean hands is most often described in this jurisdiction as a defense or an affirmative defense.[183] Colleen flips this script, attempting to use unclean hands not as a defense against an equitable claim brought against her, but as a barrier to Thomas's equitable defense of laches for the claims she brought against him.

Colleen cites only two cases, neither of which support her unclean hands defense.

Colleen relies on *In re Niki and Darren Irrevocable Trust* for the proposition that "to the extent [unclean hands] is a defense, it is a defense belonging, not to any defendant, but to the court of equity itself."[184] That case involved a family trust created for the benefit of the settlor, her daughter, and her son-in-law.[185] The settlor later decanted the trust corpus into a second trust with terms benefitting her son-in-law at the expense of herself and her daughter. Apparently recognizing the implications years later, the settlor brought suit to declare that her decanting was unlawful and requested equitable relief reinstating the

---

[182] *Haart v. Scaglia*, 2022 WL 3108806, at *16–17 (Del. Ch. May 26, 2022); *see also Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. Aug. 16, 1991) ("The question raised by a plea of unclean hands is whether the *plaintiff's* conduct is so offensive to the integrity of the court that his claims should be denied, regardless of their merit.") (emphasis added).

[183] *Bouchard v. Braidy Industries, Inc.*, 2020 WL 2036601, at *12–13 (Del. Ch. Apr. 28, 2020); *Claros Diagnostics, Inc. S'holders Rep. Committee v. Opko Health, Inc.*, 2020 WL 829361, at *6 (Del. Ch. Feb. 19, 2020); *Xu Bong Bin v. Heckmann Corp.*, 2009 WL 3440004, at *13 (Del. Ch. Oct. 26, 2009).

[184] Colleen's Answering Post-Trial Br. at 53 (quoting *In re Niki and Darren Irr. Tr.*, 2020 WL 8421676, at *14 (Del. Ch. Feb. 4, 2020)).

[185] *In re Niki and Darren Irr. Tr.*, 2020 WL 8421676, at *3.

33

original trust. The court dismissed the claims for unclean hands, finding that "[h]aving previously acted in a fiduciary capacity to settle and fund a trust through what she now asserts were illegal means, [the settlor] cannot invoke equity for relief from that action, in her own self-interest."[186] Contrary to Colleen's cherry-picked quotation, *In re Niki and Darren Irrevocable Trust* still ultimately resulted in dismissal of the plaintiff's claim, not application of unclean hands against a defendant asserting an equitable defense.

Colleen also relies on *Biddle v. Miller*, a Delaware Supreme Court Case on appeal from the Family Court.[187] *Biddle* involved a dispute between divorced spouses over the ex-husband's state pension benefits pursuant to the parties' division of their marital estate. In the interim period between the divorce settlement and the pension's vesting, the ex-husband retired six years early after learning that his ex-wife could not force distributions from his pension payments without a pension allocation order. When the ex-wife sued to force payment from the pension, his only defense was laches. The Delaware Supreme Court affirmed the Family Court's finding that the defense of laches was unavailable because the ex-husband had acted in bad faith.

At most, *Biddle* dictates that a trial court can consider foreclosing a defense of laches upon a requisite showing of bad faith. The Supreme Court only reviewed whether the trial court had abused its discretion. Further, the Supreme Court was aided by the finding that the ex-husband's "other arguments in support of his laches defense would still come up

---

[186] *Id.* at *16.

[187] 234 A.3d 161, 2020 WL 3259299 (Del. 2020) (TABLE).

short."[188]  As a result, unclean hands alone was not dispositive of the court's denial of a laches defense.

This case is more analogous to *Haart v. Scaglia*.[189]  There, the plaintiff ex-wife and her defendant ex-husband jointly owned an entity during their marriage.  The ex-wife wanted to be equal owners, and so the ex-husband purported to transfer shares to accomplish that goal.  The ex-husband withheld a one-half share, effectively rendering himself the bare majority owner, a reality the ex-wife later discovered and accepted.  When their relationship soured, the ex-husband removed the ex-wife as CEO.  The ex-wife sued to invalidate the removal, and her ex-husband brought mirror declaratory judgment claims.  The ex-wife asserted unclean hands, pointing to the ex-husband's initial concealment of the one-half share disparity.  The court found that the "unclean hands doctrine does not work here.  As an initial matter, [the ex-husband] has not meaningfully brought claims before the Court that he could forfeit."[190]  Further, the court looked to the ex-wife's own misconduct, noting that she "was long aware of . . . the fact that [her ex-husband] had one more preferred share than she did, going so far as to consult a lawyer who confirmed as much."[191]  The court concluded that the ex-wife had not properly invoked unclean hands.

Similar logic applies here.  The only claims at issue in this bifurcated trial were Colleen's claims against Thomas and TDM.  As in *Haart*, Thomas has not approached this

---

[188] *Id.* at *3.

[189] 2022 WL 3108806 (Del. Ch. Aug. 4, 2022).

[190] *Id.* at *17.

[191] *Id.*

court seeking to vindicate a claim in equity. Also as in *Haart*, Colleen acknowledged the deficiencies in the 1988 Option long ago and did her own "Google lawyering" on minority stockholders' rights while her husband engaged legal counsel. Even after Thomas's deposition, Colleen waited almost a year, until the eve of Thomas's mediation with Michael, to state her intention to bring counterclaims.

Ultimately, whether to apply the unclean hands doctrine is within the discretion of the court, relying on interests of public policy.[192] Even if Colleen could use this rationale to avoid Thomas's laches defense, equitable principles and policy concerns advise against doing so. If Colleen's proposed application were correct, she could knowingly delay in bringing her claims, then turn around and claim that her own delay was justified by Thomas's alleged misconduct. This outcome would be inconsistent with the purpose of laches to require claimants to vigilantly prosecute their rights.

## III. CONCLUSION

This lengthy and bitter family lawsuit ends here. Colleen's claims are barred by laches, and judgment is entered in favor of Thomas.

---

[192] *Nakahara*, 718 A.2d at 522–23; *see also Merck & Co., Inc. v. SmithKline Beecham Pharms. Co.*, 1999 WL 669354, at 45 (Del. Ch. Aug. 5, 1999) ("Ultimately, the doctrine is about public policy, and the Court has the broad discretion to refuse relief if [defendant] can establish that [plaintiff] does not meet a very basic though inexact standard: where the litigant's own acts offend the very sense of equity to which he appeals.").